Filed 1/23/25  P. v. Gonzales CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>JOE GONZALES,<br><br>     Defendant and Appellant. | B335438<br><br>(Los Angeles County<br> Super. Ct. No. KA040511) |

        APPEAL from an order of the Superior Court of Los Angeles County, Rogelio G. Delgado, Judge.  Affirmed.

        Michele A. Douglass, under appointment by the Court of Appeal, for Defendant and Appellant.

        Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and J. Michael Lehmann, Deputy Attorney General, for Plaintiff and Respondent.

Defendant and appellant Joe Gonzales appeals from the denial of his petition for resentencing under former Penal Code section 1170.95 (now section 1172.6).[1] The trial court determined defendant was not entitled to section 1172.6 relief as a matter of law because the jury was not instructed on attempted murder based on felony murder or the natural and probable consequences doctrine. In addition, the court concluded defendant could not have been convicted without a determination that he intended to kill the victim. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND[2]**

In mid-March 1998, defendant, who belonged to the North Side Bolen Parque gang (North Side), shouted "North Side" at Gabriel Castellanos. Castellanos interpreted this as an act of disrespect and "'flipped [defendant] off.'"

The following month, Castellanos and his friend were drinking beer in front of Castellanos's sister's apartment. At about 3:00 or 4:00 p.m., defendant arrived by car. He approached Castellanos and said, "Let's get down," which Castellanos interpreted as an invitation to fight. Castellanos declined, and defendant made a sign that meant, "You little bitch." Defendant raised his hand, moved his index finger to mimic pulling a gun's trigger, and said, "'Watch when I come back'" and "'Pow, Pow.'"

_____

[1]     All subsequent statutory references are to the Penal Code. Effective June 30, 2022, the Legislature renumbered section 1170.95 to section 1172.6. (Stats. 2022, ch. 58, § 10.) There were no substantive changes to the statute. All further references to the statute will be to the new section number.

[2]     The following facts are taken from the opinion of defendant's direct appeal, *People v. Gonzales* (May 1, 2000, B127184 [nonpub. opn.].) We do not rely on the facts in resolving this appeal.

Later that day, another car arrived with three people who approached Castellanos and his friend. Castellanos heard a voice that sounded like defendant's call out from a nearby alley, "'What's up now, bitch?'" He saw several people emerge from the alley. At trial, Castellanos testified that a person coming from the alley had a gun, but he did not recognize the person.

Castellanos and his friend ran to Castellanos's sister's apartment, while their pursuers yelled, "'North Side'" and "'You're gonna die.'" Castellanos and his friend arrived in the apartment and closed the door. Castellanos's brother and 10-year-old nephew were in the apartment. As Castellanos and his friend dove for the floor, a bullet pierced the door at shoulder level. When Castellanos's brother opened the door, no one was outside.

Police officers arrived at the apartment at about 5:30 p.m., approximately five or six minutes after the shooting. Castellanos identified defendant as the person that emerged from the alley and said, "'What's up now, bitch?'" A few days later, Castellanos's friend identified defendant as the gunman that emerged from the alley.

Defendant later told police that on the day of the shooting, Castellanos attacked him after they made eye contact. Defendant said he fled when a group of gang members arrived and chased Castellanos in another direction. Defendant testified that on that day, he worked at a restaurant from about 9:00 a.m. to 5:15 p.m. and then walked home. He denied shooting at Castellanos and his friend, and he denied being a North Side gang member. He also denied telling police officers he was present when gang members attacked Castellanos. Defendant's mother testified he was not a gang member.

In October 1998, a jury convicted defendant of attempted murder (§§ 664, 187, subd. (a); count 1), assault with a firearm (§ 245, subd. (a)(2); count 2), and shooting at an inhabited dwelling (§ 246; count 3). The jury also found true an allegation that the attempted murder was willful, deliberate, and premeditated. As to all counts, the jury found true the crimes were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1), (b)(4)). The jury, however, found not true allegations that defendant personally used or discharged a firearm. The trial court sentenced defendant to life in prison on count 1, six years on count 2, and seven years on count 3. A panel of this court modified the judgment to correct defendant's presentence custody credits and affirmed the judgment as modified.

In December 2022, defendant filed a petition for resentencing under section 1172.6. The People opposed the petition, and defendant's appointed counsel filed a reply. After a hearing, the trial court denied the petition, finding defendant ineligible for relief as a matter of law. The court determined the jury instructions demonstrated the jury found defendant intended to kill Castellanos regardless of whether he was an aider and abettor. The court indicated defendant was not convicted based on the natural and probable consequences doctrine, felony murder, or any other theory in which malice could be imputed to him. Defendant timely appealed.

## DISCUSSION

### A.   Governing Law and Standard of Review

The Legislature enacted Senate Bill No. 1437 (2017–2018 Reg. Sess.) (SB 1437) to clarify the felony-murder rule and

4

eliminate the natural and probable consequences doctrine "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); accord, § 189, subd. (e); *People v. Lewis* (2021) 11 Cal.5th 952, 957, 959.) To this end, the law specifically provided that a "person's culpability for murder must be premised upon that person's own actions and subjective mens rea." (Stats. 2018, ch. 1015, § 1, subd. (g).)

SB 1437 also added now section 1172.6, providing a procedure for defendants whose cases are final to seek retroactive relief by petitioning the sentencing court to vacate the conviction and resentence on any remaining counts. (§ 1172.6, subd. (a).) Effective January 1, 2022, Senate Bill No. 775 (2021–2022 Reg. Sess.) amended section 1172.6 to expand its coverage to individuals convicted of "attempted murder under the natural and probable consequences doctrine." (§ 1172.6, subd. (a); *People v. Saibu* (2022) 81 Cal.App.5th 709, 747.)

If a petitioner makes a prima facie showing for relief, the trial court is required to issue an order to show cause for an evidentiary hearing. (*People v. Hurtado* (2023) 89 Cal.App.5th 887, 891; § 1172.6, subds. (c), (d).) However, if the petition and record in the case establish conclusively the defendant is ineligible for relief as a matter of law, the trial court may deny the petition. (*People v. Strong* (2022) 13 Cal.5th 698, 708; *People v. Harden* (2022) 81 Cal.App.5th 45, 52 ["For example, if the record shows that the jury was not instructed on either the natural and probable consequences or felony-murder doctrines, then the petitioner is ineligible for relief as a matter of law"].)

5

We review de novo the trial court's denial of a section 1172.6 petition at the prima facie stage. (*People v. Coley* (2022) 77 Cal.App.5th 539, 545 (*Coley*); *People v. Harrison* (2021) 73 Cal.App.5th 429, 437.)

**B.      Defendant is Ineligible for Section 1172.6 Relief**

The plain language of section 1172.6 states that a person convicted of attempted murder is eligible for resentencing under section 1172.6 only if that person was convicted "under the natural and probable consequences doctrine." (§ 1172.6, subd. (a); *Coley, supra,* 77 Cal.App.5th at p. 548 ["Section [1172.6] applies by its terms only to attempted murders based on the natural and probable consequences doctrine"].) Defendant does not dispute the jurors in this case were not instructed on the natural and probable consequences doctrine. Nevertheless, defendant argues the jury instructions given were confusing and permitted the jury to convict defendant by imputing the intent to kill from the actual shooter to him as an aider and abettor. We are not persuaded.

In arguing that the jury was not instructed that they had to find he personally harbored the intent to kill, defendant focuses on certain language in CALJIC Nos. 3.31 (instructing jury "there must exist a union or joint operation of act or conduct and a certain specific intent in the *mind of the perpetrator*" for the crime of attempted murder), 8.66 (attempted murder elements requiring that the "*person committing the act*" harbor a specific intent to kill), and 8.67 (elements required to find premeditation for attempted murder referring to the "*would-be slayer*"). (Italics added.) Defendant also argues the aiding and abetting

instruction, CALJIC No. 3.01, was flawed because it said "nothing explicitly about harboring the intent to kill."

The instructions given, read as a whole, point to the need for the jury to find defendant acted with express malice. CALJIC No. 3.31 instructed the jury that the crime of attempted murder required a specific intent in the perpetrator's mind. It stated, "Unless this specific intent exists the crime or allegation to which it relates is not committed or is not true." It referred to the attempted murder instruction, CALJIC No. 8.66, for the specific intent required.

CALJIC No. 8.66 instructed the jury that to prove attempted murder, each of the following elements had to be proved: "(1) A direct but ineffectual act was done by one person towards killing another human being; and [¶] (2) The person committing the act harbored express malice aforethought, namely, a specific intent to kill unlawfully another human being." As to the theory of aiding and abetting, CALJIC No. 3.01 instructed that "[a] person aids and abets the commission or attempted commission of a crime when he or she "(1) with knowledge of the unlawful purpose of the perpetrator and (2) with the intent or purpose of committing or encouraging or facilitating the commission of the crime, and (3) by act or advice aids, promotes, encourages or instigates the commission of the crime."

In order to convict defendant as an aider and abettor of attempted murder under these instructions, the jury was required to find that defendant knew another person intended to kill Castellanos, that defendant intended to aid and abet the other person in committing the killing, and that defendant aided, promoted, encouraged, or instigated the attempted murder by his

7

own words or conduct.  Consequently, because CALJIC No. 8.66 required a determination that the shooter intended to kill, the jury necessarily found defendant knew of and shared the intent to kill as an aider and abettor, which constituted a finding defendant himself harbored express malice.  (See *People v. Lee* (2023) 95 Cal.App.5th 1164, 1191–1192 [even assuming appellant was convicted of attempted murder as an aider and abettor, the instructions necessarily required the jury to find he intended to aid and abet an unlawful killing—"the very definition of express malice"]; *Coley*, *supra*, 77 Cal.App.5th at pp. 547–548 ["by finding appellant guilty of attempted murder, the jury necessarily found he had personally harbored intent to kill or express malice when he aided and abetted the [underlying] murder"].)  There was no ambiguity in the language of CALJIC Nos. 3.31 and 8.66 as to this requirement.

Concerning CALJIC No. 8.67, the instruction required the jury to find defendant guilty of attempted murder before considering the truth of the allegation.[3]  This means the jury already determined defendant shared the shooter's intent to kill and was guilty as an aider and abettor of attempted murder before considering whether the crime was willful, deliberate, and premeditated.  Moreover, CALJIC No. 8.67 does not concern the requisite intent or mental state required for a conviction of attempted murder.  (See *People v. Smith* (2005) 37 Cal.4th 733, 739–740 [attempted murder requires specific intent to kill, and

---

[3]     The first paragraph of CALJIC No. 8.67 stated in part, "It is also alleged in Count 1 that the crime attempted was willful, deliberate, and premeditated murder.  If you find the defendant guilty of attempted murder, you must determine whether this allegation is true or not true."

8

the prosecution may seek an additional finding of premeditation "for purposes of sentence enhancement"].)  By finding defendant guilty of attempted murder, the jury necessarily found he personally harbored express malice when he aided and abetted the crime regardless of the instruction given as to the premeditation enhancement.

Defendant's reliance on *People v. Powell* (2021) 63 Cal.App.5th 689 (*Powell*) and *People v. Langi* (2022) 73 Cal.App.5th 972 (*Langi*) in asserting that the instructions "may have led to jurors failing to find express malice on the part of an aider and abettor like [defendant]" is misplaced.

*Powell*, a direct appeal, found the standard CALCRIM aiding and abetting instruction (CALCRIM No. 401) was "not tailored for" the crime of second degree implied-malice murder. (*Powell, supra*, 63 Cal.App.5th at p. 714.)  For implied-malice murder liability, "[t]he mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life." (*Id.* at p. 713, fn. omitted.)  While CALCRIM No. 401 required an intent to aid and abet a "crime," it did not instruct the jury that the aider and abettor must personally harbor the mental state of implied malice to be convicted of second degree murder.  (*Id.* at p. 714.)  The instructions were, therefore, erroneous.  (*Ibid.*)

*Langi* extended *Powell's* reasoning to the section 1172.6 context.  *Langi* found the CALJIC second degree murder instruction (CALJIC No. 8.31) required the jury to find the perpetrator deliberately performed a fatal act—in that case, a

9

punch—"with knowledge of the danger to, and with conscious disregard for, human life," but it did not require finding that the perpetrator's purpose was to kill the victim. (*Langi*, *supra*, 73 Cal.App.5th at pp. 981–982.) For the jury to then convict the appellant as an aider and abettor of second degree murder under CALJIC No. 3.01, the jury could have found the appellant only intended to encourage the deliberate punch, regardless of whether or not he "intended to aid or encourage [the] killing," or "knew of and disregarded the risk of such a killing." (*Id.* at p. 983.) The record of the appellant's second degree murder conviction, thus, did not conclusively negate the possibility that the jury found him guilty as an aider and abettor on an imputed malice theory, so an evidentiary hearing was required. (*Id.* at pp. 983–984.)

*Powell* and *Langi* are distinguishable as they involved implied malice, and the instructions in this case did not include the problematic second degree murder instruction. In *Langi*, the perpetrator that threw the fatal punch may not have had murderous intent, but in this case, the jury was required to find that defendant, even as an aider and abettor, personally harbored express malice. (See *Coley*, *supra*, 77 Cal.App.5th at pp. 547–548 [holding *Langi* inapplicable where attempted murder conviction based on jury instructions requiring intent to kill]; see also *People v. Covarrubias* (2016) 1 Cal.5th 838, 890 ["'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing'"].) We decline to assume that the jurors misunderstood or misapplied the instructions given and found defendant guilty of attempted murder without finding he harbored express malice. (*People v. Buenrostro* (2018) 6 Cal.5th 367, 431 ["We presume

10

jurors understand and follow the instructions they are given, including the written instructions"].)

Upon considering the relevant jury instructions, we see no errors or ambiguities. The instructions did not permit the jury to convict defendant of attempted murder under the natural and probable consequences doctrine or any other theory of imputed malice. Thus, the trial court did not err in denying defendant's petition without issuing an order to show cause.[4] (See *Coley*, *supra*, 77 Cal.App.5th at p. 548 ["Direct aiding and abetting remains a valid theory of attempted murder after the enactment of Senate Bill No. 775"]; see also *People v. McCoy* (2001) 25 Cal.4th 1111, 1118 [an "aider and abettor must know and share the murderous intent of the actual perpetrator"].)

---

[4] We need not and do not reach the People's alternative argument that defendant's claim of instructional error should have been raised on direct appeal instead of a section 1172.6 petition, citing *People v. Burns* (2023) 95 Cal.App.5th 862 and *People v. Berry-Vierwinden* (2023) 97 Cal.App.5th 921.

## DISPOSITION

The order is affirmed.

MORI, J.

We concur:

CURREY, P. J.

COLLINS, J.